**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SOPHIA LEWIS, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF SHAMOND LEWIS, DECEASED** | § § § § § | |
| **VS.** | § § | **CIVIL ACTION NO. 3:23-CV-00381-D** |
| **DALLAS COUNTY; SERGEANT CHRISTOPHER LOBODA; OFFICER JAMES MCDANIEL; OFFICER JAVIER TAVERA-LUNA; OFFICER ROCHELLE ROEMEN; OFFICER ANNETTE GRANT; and OFFICER FUQUAN CHILDRESS** | § § § § § § § § | |

---

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT GRANT'S MOTION FOR SUMMARY JUDGMENT ASSERTING QUALIFIED IMMUNITY**

---

Respectfully submitted,

**CLARK | VON PLONSKI | ANDERSON**

By: *R. Connor Barbe*
**COLLEN A. CLARK**
State Bar No. 04309100
**JACOB L. von PLONSKI**
State Bar No. 24098554
**R. CONNOR BARBE**
State Bar No. 24108598
**LINDA LE**
State Bar No. 24126312
3500 Maple Avenue, Suite 1250
Dallas, Texas 75219
214-780-0500
214-780-0501 Facsimile
Eservice – eservice@cvpalaw.com

*In association with:*

**THE PIPKIN LAW FIRM**

**STEPHEN C. PIPKIN**
State Bar No. 00784766
3500 Maple Avenue, Suite 1250
Dallas, Texas 75219
Telephone: 214-780-0512
Facsimile: 866-789-6956
Email – steve@pipkinlawfirm.com

***Attorneys for Plaintiff***

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I. SUMMARY OF PLAINTIFF'S RESPONSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. SUMMARY JUDGMENT EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV. ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

A. Excessive Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

1. The Facts That Plaintiff Has Alleged Establish a Violation of a Constitutional Right . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

a. The Relationship Between the Need for the Use of Force and the Amount of Force Used . . . . . . . . . . . . . . . . . . . . . . . . 13

b. The Extent of Lewis's Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

c. Any Effort Made by the Officer to Temper or to Limit the Amount of Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

d. The Severity of the Security Problem at Issue & The Threat Reasonably Perceived by the Officer. . . . . . . . . . . . . . . . . . . . . . . 17

e. Whether Lewis was Actively Resisting . . . . . . . . . . . . . . . . . . . . 17

2. Lewis's Fourteenth Amendment Right to be Free From the Use of Excessive Force Was Clearly Established at the Time of Grant's Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B. At a Minimum, Genuine Issues of Material Fact Preclude Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
477 U. S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)

*Bazan v. Hidalgo Cnty.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
246 F.3d 481 (5th Cir. 2001)

*Brothers v. Zoss* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
837 F.3d 513 (5th Cir. 2016)

*Deville v. Marcantel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
567 F.3d 156 (5th Cir. 2009)

*Fairchild v. Coryell Cnty.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
40 F.4th 359 (5th Cir. 2022)

*Harlow v. Fitzgerald* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)

*Hope v. Pelzer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 19
536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)

*Jennings v. Patton* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
644 F. 3d 297 (5th Cir. 2011)

*Joseph on behalf of Est. of Joseph v. Bartlett* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
981 F.3d 319 (5th Cir. 2020)

*Kingsley v. Hendrickson* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
576 U.S. 389, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015)

*Pearson v. Callahan* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)

*Simpson v. Hines* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20
903 F.2d 400 (5th Cir. 1990)

*Thomas v. Great Atl. & Pac. Tea Co.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
233 F.3d 326 (5th Cir. 2000)

*Tolan v. Cotton* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13, 16, 19, 20
572 U.S. 650, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)

## Rules and Statutes

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Sophia Lewis ("Plaintiff") submits this Brief in support of her Response to Defendant Grant's ("Grant") Motion for Summary Judgment Asserting Qualified Immunity (Docs. #70-72), and would respectfully show the Court as follows:

## I. SUMMARY OF PLAINTIFF'S RESPONSE

On September 22, 2022, Plaintiff's son Shamond Lewis was a physically healthy, 24-year-old young man who suffered from paranoid schizophrenia. He was booked into the Dallas County Jail that morning, and within 15 hours, as a result of the excessive force to his body by Defendant Annette Grant and other Detention Services Officers ("DSO") in a room without surveillance cameras, Shamond Lewis became unresponsive, was brain dead within hours, and died six days later.

The situation was described by two of the Tarrant County Sheriff's Office criminal investigators tasked with finding out what occurred, as they were speaking with one of the DSO witnesses about Lewis:

> DETECTIVE WILLIAMS: But the issue is that whatever happened in there, five minutes later he's dead.
>
> THE WITNESS: Oh, my God. Really?
>
> DETECTIVE WILLIAMS: He's unconscious. He never comes back. So—
>
> SERGEANT SHELTON: For all intents and purposes, he's being kept alive by machines.
>
> DETECTIVE WILLIAMS: And that's our issue. That's why we're here.
>
> THE WITNESS: Five minutes?
>
> DETECTIVE WILLIAMS: It's about five minutes, give or take a couple of minutes before he goes unconscious, and never comes back. He's on a ventilator, a

week later he's pronounced—

THE WITNESS: Oh, my God.

DETECTIVE WILLIAMS: And that's the issue that we have is because the mother, in her mind, he's 24 years old. You know, he does something from MHMR conditions, he's taken in by Dallas County sheriff deputies on patrol, and she's actually happy because, you know, she's like, I don't want him going to jail, per se, but can he get help, mental help and stuff like that and the deputy reassures her that once he gets in custody, you know, he's going to receive that type of care.

And she's even thankful. You know, and even tells me, you know, I'm glad it's you two that came here because who knows what could have happened if another officer got here who wasn't patient with my son. And for her, you know, she sees her son leave and he's going to get care and then she finds out two days later that he's in a coma and then he passes.

And that's kind of where we're at is that we're trying to figure out, you know, what happened. You know, it's not necessarily that we're saying that hey, you know, this person did something wrong, this person did something wrong, but it's very peculiar, you know, when—

THE WITNESS: Absolutely.

DETECTIVE WILLIAMS: —you know, you have a 24-year-old who's—just so happens to be slightly out of camera view, physical altercation and then he—he passes, you know.

(P. App. 67-68) (Sawyer interview at 24/7 - 25/25)

In this Brief and her Appendix, Plaintiff presents summary judgment evidence refuting Defendant Grant's alleged entitlement to qualified immunity on Plaintiff's federal claims under 42 U.S.C. § 1983. The competent summary judgment evidence that Plaintiff adduces includes documents obtained in discovery and video interviews with other persons present in the room when the excessive force occurred. One of the DSO witnesses repeatedly stated in an official interview with investigators that Grant stood with both her feet on Lewis's legs as he was face down in the changing room. Grant's conduct constituted excessive force and violated Plaintiff's constitutional rights. At the very least, the evidence that Plaintiff submits raises genuine issues of material fact as

to Grant's entitlement to qualified immunity. Therefore, Grant's motion for summary judgment should be denied in its entirety.

## II. SUMMARY JUDGMENT EVIDENCE

Plaintiff disputes the "undisputed" facts that Grant relies on in her summary judgment motion. The only substantive document in Grant's entire Appendix is her own self-serving Affidavit in which, as expected, she denies any responsibility for Lewis's death. Plaintiff cites the following evidence included in her Appendix and incorporated by reference herein in support of her response:

| Exhibit | Description | Appendix Pages |
|---|---|---|
| 1 | Affidavit of R. Connor Barbe | 1-2 |
| 2 | Chronology of Events | 3 |
| 3 | Dallas County Jail Central Intake Form | 4-5 |
| 4 | Sgt. Loboda Statement | 6-7 |
| 5 | Autopsy Report | 8-12 |
| 6 | Tavera Statement | 13-29 |
| 7 | Parkland Death Timeline | 30 |
| 8 | Tarrant County Sheriff's Office Report | 31-52 |
| 9 | Medical Examiner Investigation Narrative | 53-57 |
| 10 | Sawyer Statement | 58-73 |
| 11 | Amended Custodial Death Report | 74-81 |
| 12 | First Grant Statement | 82-89 |
| 13 | Second Grant Statement | 90-104 |

## III. FACTS

On September 22, 2022, Shamond Lewis ("Lewis")[1] was a physically healthy 24-year-old male who suffered from paranoid schizophrenia. (D. App. 8) He was arrested on an aggravated assault charge and booked into the Dallas County Jail as a pretrial detainee without incident at about 10:30 a.m. (P. App. 3) (Chronology of Events) Lewis had been in the Jail before, and Jail personnel were aware of his mental illness, as reflected on the Jail Intake form. (P. App. 5) (Dallas County Jail Central Intake Form) Lewis was placed on suicide precaution to be monitored in an intake holding single cell. (P. App. 3) (Chronology of Events)

Video of a jail hallway provided by Dallas County shows that everything changed for Lewis shortly after midnight. (D. App. 49) At 12:41 a.m. on September 23, 2022, a sergeant and DSOs brought Lewis to the book-in window, and he is seen calmly standing beside Jail officers. (D. App. 49) At 12:45 a.m., the officers take Lewis into an adjacent room—one of the few places in the Jail out of view of surveillance cameras—to change him into jail clothes. (D. App. 49)

According to Sgt. Loboda, the supervisor in charge, Lewis refused to get changed out. At the time, Lewis was being escorted by Loboda and DSOs Tavera and McDaniel. Loboda stated, "As I attempt to restrain him by grasping his right arm, he pulled away from me and curled into a ball. Lewis was given several commands to give us his hands and quit resisting. I made several attempts to place him in a straight shoulder lock but Lewis kept resisting, was screaming, and put his other hand under his body. I was able to get one handcuff on this right arm but was not able to get his left arm." Lobada stated that *<u>six</u>* additional officers arrived to assist in gaining control of Lewis: DSOs Grant, Davis, Childress, De LaCruz, Emanuel, and DTO Roeman. "Once Lewis was handcuffed, he was taken the rest of the way into the change out room where his clothes were cut off him and he

---

[1] Because Plaintiff Sophia Lewis and her deceased son Shamond Lewis have similar names, she will refer to herself as "Plaintiff" and her son as "Lewis" in her Response and Brief.

was dressed out into a Dallas County Jail jumper." Loboda requested a restraint chair. (P. App. 6) (Sgt. Loboda Statement at 1)

Eight minutes later, at 12:53 a.m., Jail officers wheeled out Lewis in a restraint chair for transfer to the Medical Assessment Program clinic referred to as MAP N0105. (P. App. 3) (Chronology of Events) In the Autopsy Report for Lewis, Dr. Stephen Lenfest, the medical examiner who performed the autopsy, described Lewis's condition before and after he was taken out of the changing room:

> There is video surveillance that shows the decedent walking, talking, and apparently without complaint for a time period that spans more than one hour. The decedent is seen to walk into a changing room with law enforcement officers. There is video footage of the hallway outside of the changing room, but there is no video surveillance of the inside of the room. The available investigative information indicated that multiple law enforcement officer[s] restrained the decedent in an effort to change his clothes, and during this incident he was placed in handcuffs. The decedent was also placed in a restraint chair in the changing room. When the decedent is brought out of the changing room, he can again be seen on the video surveillance. He appears to have acute mental status changes but appears to be breathing and moving for several minutes prior to becoming unresponsive.

(P. App. 10) (Autopsy Report at 8)[2] When they arrived at the clinic, Sgt. Loboda gave Lewis a cup of water. Lewis told Sgt. Loboda that he couldn't breathe, then all of a sudden, he went unconscious. (P. App. 14) (Tavera Statement at 5/14-24)[3]

The Medical Director of Parkland Correctional Health Services, Dr. Barry Lewis Harris, prepared a death timeline for the Texas Commission on Jail Standards. The timeline described the events of September 23, 2022 as follows:

---

[2] Investigating Detective Williams viewed the surveillance footage and observed, "Shamond is rolled out of the change out room in the restraint chair. Shamond appears to be disoriented as his head sways from side to side while sitting in the restraint chair." (P. App. 57) (TCSO Report)

[3] Plaintiff retained a certified court reporter to transcribe Officer Tavera's, Officer Sawyer's, and Officer Grant's video interviews.

> Mr. Lewis was brought to the MAP clinic from Central Intake. A nurse checked for a pulse in the right carotid, no pulse was felt. CPR was initiated by nursing staff, including using an AED, which advised no shock. CPR was continued by workforce members. Mr. Lewis suddenly took a large gasp of air and compressions stopped at that time. Pulse felt in right carotid. Mr. Lewis is bagged, IV placed to the left antecubital with 22g. Narcan was administered, no response from Mr. Lewis. The nursing staff maintained the airway until EMS arrived and assumed care. Mr. Lewis was transferred out to Parkland Emergency Department by EMS. Mr. Lewis was admitted to Parkland Hospital.

(P. App. 30) (Parkland Timeline)

Six days after he left the Jail in an ambulance, on September 29, 2022, "Mr. Lewis was declared brain dead while admitted to Parkland Hospital at 6:48 PM by Nuclear Medicine Cerebral Blood Flow Test performed earlier in the day." (P. App. 30) (Parkland Timeline) On September 30, 2022, "Mr. Lewis was maintained on external respiratory support to allow for organ donation with the transplant team." (P. App. 30) (Parkland Timeline)

Medical examiner Dr. Lenfest noted in the Autopsy Report that Lewis had superficial blunt force injuries to his face, shoulders, upper extremities and lower extremities and hemorrhage in both wrists, tongue, upper back musculature, and focal subscapular hemorrhage. Dr. Lenfest listed the cause of death and manner of death as "undetermined." (P. App. 9-12) (Autopsy Report at 7-9)

On September 29, 2022, the day that Lewis was pronounced dead, Dallas County asked the Tarrant County Sheriff's Office ("TCSO") Criminal Investigations Division ("CID") to investigate the Lewis incident. (P. App. 34) (TCSO Report 3) As part of that investigation, CID investigators conducted interviews recorded on video of numerous witnesses, including the officers in the changing room with Lewis, and other DSOs present during Lewis's hours in the Jail. (P. App. 37-40) (TCSO Report 6-9)

One of the DSOs CID investigator Detective Williams interviewed was Javier Tavera-Luna, who was present before, during and after the incident with Lewis in the changing room. Tavera

witnessed Grant on top of Lewis's legs to hold him down in the changing room. Grant was standing on Lewis, on top of Lewis's legs. (P. App. 15-17, 22) (Tavera Statement at 11/10-20 and 14/23-25 and 20/4-7 and 68/20-23) Grant stood on top of Lewis with both of her feet. (P. App. 21) (Tavera Statement at 67/2-5) When Grant was standing on Lewis's legs, he was screaming, Why are you doing this to me? What are you doing to me? (P. App. 28, 29) (Tavera Statement at 81/13-16 and 99/15-19) Tavera stated that Grant might have moved up from the legs to the upper parts of Lewis's body. (P. App. 22-23) (Tavera Statement at 68/20 - 69/05)

Tavera told the investigators he knew that standing on an inmate was unacceptable, and he was trained to not do so; their training is that officers don't step on or put their knees on inmates. (P. App. 24) (Tavera Statement at 73/22 - 74/1) Tavera stated that Grant was the only officer on top of Lewis. (P. App. 25) (Tavera Statement at 76/2-6) He never heard anyone tell Grant to get off of Lewis. (P. App. 25) (Tavera Statement at 76/21-23)

The next day after this happened, Tavera learned that Lewis was brain dead, and he told Officer Susan Sawyer that Grant was on top of Lewis. (P. App. 26-27) (Tavera Statement at 78/19 - 79/3) Sawyer responded that they weren't supposed to do that. (P. App. 27) (Tavera Statement at 79/4-6) He knew and Sawyer knew that Grant's conduct was wrong. (P. App. 27-28) (Tavera Statement at 79/16-18 and 81/2-4)

When Lewis was handcuffed, he was laying on his chest with his hands cuffed behind his back. The officers dragged Lewis further back into the changing room. (P. App. 18-19) (Tavera Statement at 40/5-14 and 41/20-22) While Lewis was on the floor, the officers pulled off Lewis's shorts and underwear and cut off his shirt. (P. App. 20) (Tavera Statement at 42/12-25) Then they put on his underwear, Jail pants and top, and put Lewis in the restraint chair. (P. App.) (Tavera Statement at 45/20 - 46/3)

TCSO investigators interviewed Grant twice, on October 4 and October 7, 2022. (P. App. 37-39) (TCSO Report 6-8) In her first interview, Grant told Sergeant Shelton that when she went in the changing room, there were three or four officers working to gain control of Lewis. (P. App. 83) (Grant First Statement at 5/13-14) Grant stated she sat on the back of Lewis's legs so he would stop kicking everybody. She sat on the back of his thighs. She had his hips. (P. App. 83-85) (Grant First Statement at 5/15-17 and 8/23-24 and 9/8 and 9/10-11) After the officers placed the handcuffs on Lewis, she left. (P. App. 86) (Grant First Statement at 13/8-9) She was there five minutes, tops. (P. App. 87) (Grant First Statement at 15/2-4) Grant thought their handling of the situation was by the book and they didn't do anything to cause death. (P. App. 88-89) (Grant First Statement at 25/7-8 and 31/3-4)

Grant's second interview was with Detective Williams and Sergeant Shelton. Grant said that when she went to the change-out room, Lewis had his back against the wall and was kicking. She told Tavera to get out of the way, they rolled Lewis over on his stomach, and she straddled the back of Lewis's thighs. (P. App. 91-92) (Grant Second Statement at 4/21 - 5/16) While she is holding his legs, she is calling for handcuffs, barking orders. (P. App. 99, 101) (Grant Second Statement at 21/10-12 and 27/11-12) Grant and McDaniel had Lewis's right arm. They handcuffed Lewis and she left, as they were in the process of changing his clothes. (P. App. 93, 102, 103) (Grant Second Statement at 6/1 and 28/15-16 and 35/7-9) She didn't look back to see if Lewis was conscious. (P. App. 102) (Grant Second Statement at 28/5-8)

Grant stated they used minimum force, that's why he wasn't hurt. (P. App. 95) (Grant Second Statement at 12/16-17) Grant said she squatted on Lewis's thighs, she didn't sit on his thighs. (P. App. 94) (Grant Second Statement at 14/7-10) She was still in a squatting position when they rolled him over. (P. App. 96) (Grant Second Statement at 15/9-10) She was over his hip. (P. App. 97)

(Grant Second Statement at 18/19-22) She said, "I'm sitting on his hip so his legs weren't moving." (P. App. 100) (Grant Second Statement at 22/4-6) She wasn't in the room very long; the camera will show the time. (P. App. 98) (Grant Second Statement at 20/15-19) Grant declared, "I am telling the truth about every event that I witnessed in that short time period." (P. App. 104) (Grant Second Statement at 37/5-7)

In his TCSO Report, Detective Williams stated:

> Officer A. Grant was called in for a second interview. During this interview, Officer A. Grant became confrontational and argumentative. Officer A. Grant stated that she had hovered over Shamond in a squatting position while she held his arms. Officer A. Grant demonstrated the hovering position. This position seemed difficult for her to maintain during the short duration of her demonstration. This led me to believe that Officer A. Grant could not have held this position for the duration of the use of force. Officer A. Grant did not change her account of events.

(P. App. 39) (TCSO Report 8)

On October 24, 2022, Detective Williams contacted the medical examiner's office and reported the following information:

> Det. Williams with TSO contacted DCME wanting to relay new findings in the case to the pathologist. He stated he had conducted interviews with approximately 30 people and it appears that one of the jailors was fully standing, with both feet, on the decd's back while they were trying to restrain him. She was upright with her hands by her side and approximately 180-190 pounds.

The medical examiner staff person who spoke with Detective Williams noted, "I stated to keep us updated with further investigation and this info would be noted in the case." (P. App. 57) (Medical Examiner Investigation Narrative at 5)

Another of the DSOs Detective Williams interviewed was Officer Sawyer, interviewed on October 7, 2022. Officer Sawyer was present when Lewis was at the booking room window and was told he must change his clothes, as she described:

> he was pretty compliant at first and then when they started to take him into the dressing room, he kind of switched. And so he, you know, was just—he just didn't want to do it. So the sergeant came out and got behind him and he sent me to get another guy from the other side release, so I went over there and got him and then they took him [Lewis] in to dress him out, which they kind of forcefully took him in.

(P. App. 59-60) (Sawyer interview at 5/19 - 6/1) Sawyer explained that the officers had Lewis by the arms as they took him in the room. (P. App. 64) (Sawyer interview at 16/14-17) Sawyer elaborated:

> I went over to get Davis and Davis wasn't there. And the lady over there, Ms. Grant, said, what you need? And I said, well, we need help over here. They need help, you know, with the guy that's kind of out of control or whatever. I didn't really know exactly what was going on because I wasn't in there where he was. Because, you know, the ladies don't go in to dress the guys out, so I stayed outside. But she came over and went in there. I don't know how she got in there, but she got in there.

(P. App. 61) (Sawyer interview at 7/12-23) There was yelling in the room, and as the officers were trying to handcuff Lewis, he said that he needed some water. (P. App. 63) (Sawyer interview at 12/12-19) Sawyer heard one of the officers call for a restraint chair, so she went down to the first floor to get one and she brought it in. (P. App. 60) (Sawyer interview at 6/15-18)

In describing how the officers restrained Lewis, Sawyer said, "everybody was on him." (P. App. 69) (Sawyer interview at 26/19-20) Sawyer related to the investigators that Tavera told her that Grant put her knee on Lewis but they made him take that out of his report. (P. App. 71-73) (Sawyer interview at 40/15-16 and 41/10-12 and 42/2-4) Tavera was very afraid that he would lose his job. (P. App. 71) (Sawyer interview at 40/1-5)

Sawyer told Detective Williams that Lewis "just didn't seem to be in his right mind." (P. App. 62) (Sawyer interview at 8/18-19) Sawyer had experience working in the west tower in the psych area, and she commented that "you have to be more patient and take more time to deal with those kind of people." (P. App. 65) (Sawyer interview at 17/13-17) Sawyer told Detective Williams, "personally, I think they could have talked to him a little bit more and maybe got him to comply."

(P. App. 66) (Sawyer interview at 23/8-9) She said she thinks they could have taken more time instead of being so aggressive so quickly. (P. App. 70) (Sawyer interview at 35/5-12)

## IV. ARGUMENT AND AUTHORITIES

The summary judgment evidence that Plaintiff discusses in this Brief and presents in her Appendix refutes Grant's alleged entitlement to qualified immunity on her federal claims under 42 U.S.C. § 1983. At the very least, the evidence that Plaintiff submits raises genuine issues of material fact as to Grant's entitlement to qualified immunity. Therefore, viewing the facts in the light most favorable to the non-moving party and drawing all reasonable inferences in her favor as the Court is required to do, Grant's motion for summary judgment should be denied in its entirety.

Grant asserts in error that she is entitled to qualified immunity for Plaintiff's federal claims under 42 U.S.C. § 1983. "The doctrine of qualified immunity protects government officials 'from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U. S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U. S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). To determine whether a public official is entitled to qualified immunity, the district court determines: "(1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Jennings v. Patton*, 644 F. 3d 297, 300 (5th Cir. 2011). District courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U. S. at 236.

### A. Excessive Force

Force against a pretrial detainee is "excessive" and a violation of the Fourteenth Amendment when the force was objectively unreasonable. *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015); *Fairchild v. Coryell Cnty.*, 40 F.4th 359, 362-63 (5th Cir. 2022). The following factors bear on the reasonableness inquiry:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397. The Court must assess the reasonableness of the force from the perspective of a jailer who is often forced to make split-second decisions in tense situations. *Id*. at 399. Although reasonableness in excessive force cases is viewed from the officer's perspective, that does *not* mean the Court automatically accepts her testimony about what happened. *Tolan v. Cotton*, 572 U.S. 650, 657, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014) (emphasis added). As is always true at summary judgment, the facts must be viewed in favor of the nonmovant. *Id*; Fed. R. Civ. P. 56.

As the Supreme Court explained in *Tolan*, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. *Tolan*, 572 U.S. at 656; *Hope v. Pelzer*, 536 U.S. 730, 733, n.1, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002). This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan*, 572 U.S. at 656, *citing Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue is "*genuine*" if it is real and substantial, as opposed to merely formal, pretended, or a sham. *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001). A fact is "*material*" if it "*might affect* the outcome of the suit under the governing law." *Id.*, *citing Anderson,* 477 U.S. at 248.

### 1. The Facts That Plaintiff Has Alleged Establish a Violation of a Constitutional Right

The facts that Plaintiff has alleged establish a violation of a constitutional right. In her Fifth Amended Complaint, Plaintiff asserts that the individual defendants, including Grant, violated Shamond Lewis's constitutional right to be free from the use of unreasonable, unnecessary, and excessive force when they beat and physically abused him. Grant's use of force was unreasonable, unnecessary and excessive under the *Kingsley* factors identified above.

#### a. The Relationship Between the Need for the Use of Force and the Amount of Force Used

The Fifth Circuit has made clear that force which is disproportionate to the need is unreasonable. *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 324 (5th Cir. 2020). DSO Tavera repeatedly stated that he saw Grant standing on top of Lewis's legs to hold him down. (P. App. 15-17, 22) (Tavera Statement at 11/10-20 and 14/23-25 and 20/4-7 and 68/20-23) Grant stood on top of Lewis with both of her feet. (P. App. 21) (Tavera Statement at 67/2-5) When Grant was standing on Lewis's legs, he was screaming, Why are you doing this to me? What are you doing to me? (P. App. 28-29) (Tavera Statement at 81/13-16 and 99/15-19)

In her self-serving Affidavit, Grant denies Tavera's account, claiming,

> During the time Defendant was in the change-out room assisting with gaining control of Mr. Lewis, Defendant did not kick, beat, stand on, use her knee on, or assault Mr. Lewis, and Defendant did not otherwise use more force than was reasonably necessary to assist the other detention officers with gaining control of Mr. Lewis. Appx. p. 003.

(D. App. 3, ¶ 7)

In her two statements to the Tarrant County investigators, Grant gave an inconsistent account of her actions in the changing room. In her first interview, Grant told Sergeant Shelton that she *sat on the back of Lewis's legs* so he would stop kicking. She *sat on the back of his thighs*. She had his

hips. (P. App. 83-85) (Grant First Statement at 5/15-17 and 8/23-24 and 9/8 and 9/10-11) In Grant's second interview with Detective Williams and Sergeant Shelton, Grant told them that she *straddled the back of Lewis's thighs*. (P. App. 91-92) (Grant Second Statement at 4/21 - 5/16) Then Grant said *she squatted on Lewis's thighs*, she didn't sit on his thighs. (P. App. 95) (Grant Second Statement at 14/7-10) She was still in a squatting position when they rolled him over. (P. App. 96) (Grant Second Statement at 15/9-10) She was over his hip. (P. App. 97) (Grant Second Statement at 18/19-22) She stated, "*I'm sitting on his hip* so his legs weren't moving." (P. App. 100) (Grant Second Statement at 22/4-6)

Detective Williams did not find credible Grant's change in story from sitting on Lewis's thighs to squatting or hovering over his thighs. In his TCSO report, Williams stated, "Officer A. Grant stated that she had hovered over Shamond in a squatting position while she held his arms. Officer A. Grant demonstrated the hovering position. This position seemed difficult for her to maintain during the short duration of her demonstration. This led me to believe that Officer A. Grant could not have held this position for the duration of the use of force." (P. App. 39) (TCSO Report 8)

The Autopsy Report reflects that at the time of his death, Lewis weighed 178 pounds and he was 5 feet, 8 inches tall. (P. App. 8) (Autopsy Report at 1) Tavera witnessed Grant standing on top of Lewis's legs to hold him down in the changing room, standing on top of Lewis with both of her feet. In his call to the medical examiner's office, Detective Williams related that "it appears that one of the jailors was fully standing, with both feet, on the decd's back while they were trying to restrain him. She was upright with her hands by her side and approximately 180-190 pounds." (P. App. 57) (Medical Examiner Investigation Narrative at 5) Thus, Grant weighed at least as much if not more

than Lewis did, and she had her entire body weight pressing down on Lewis's legs and his back in the changing room.

The circumstance of Grant standing with her body weight on Lewis's legs and back is especially incomprehensible considering that Grant was not trying to subdue Lewis by herself. According to Grant's supervisor, Sergeant Loboda, when Lewis refused to get changed out, he was being escorted by Loboda and DSOs Tavera and McDaniel. Soon six additional officers arrived to assist in gaining control of Lewis: DSOs Grant, Davis, Childress, De LaCruz, Emanuel, and DTO Roeman. (P. App. 6) (Sgt. Loboda Statement at 1) That means as many as nine Jail officials were in the changing room using force on Lewis. DSO Sawyer, who was observing from the doorway, described how the officers restrained Lewis by saying "everybody was on him." (P. App. 69) (Sawyer interview at 26/19-20)

This is the classic situation of testimony that creates a material fact issue, where the accounts of two people are so contradictory that both cannot be true. DSO Tavera told the investigators he knew that standing on an inmate was unacceptable, and he was trained to not do so; their training is that officers don't step on or put their knees on inmates. (P. App. 24) (Tavera Statement at 73/22 - 74/1) Here, fact issues exist as to whether Grant responded to the situation reasonably pursuant to her training.

In her Brief, Grant invokes the principle that everything must be viewed from her perspective, ignoring the Supreme Court's determination that although reasonableness in excessive force cases is viewed from the officer's perspective, *that does not mean the Court automatically accepts her testimony about what happened*. *Tolan v. Cotton*, 572 U.S. 650, 657, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014). A reasonable jury could find that the degree and amount of force which Grant exerted on Lewis exceeded the need.

#### b. The Extent of Lewis's Injury

Lewis walked into the changing room on his own power and eight minutes later, he was wheeled out of it in a restraint chair with obvious signs of distress. He became unresponsive within about five minutes, was measured as brain dead within hours, was never again conscious, and was pronounced dead six days later. The medical examiner noted that there was no surveillance cameras in the changing room and was clearly troubled by what had happened to this 24-year-old young man, but concluded he lacked the physical/medical evidence from his examination of Lewis's body to provide a specific cause or manner of death.

#### c. Any Effort Made by the Officer to Temper or to Limit the Amount of Force

There is no evidence that Grant ever made any effort to temper or limit the amount of force she used on Lewis. According to her statement, she entered the room and immediately told Tavera to move aside. Then according to Tavera, she stood on Lewis's legs. Grant stated as soon as Lewis was handcuffed, she left the room.

#### d. The Severity of the Security Problem at Issue & The Threat Reasonably Perceived by the Officer

Plaintiff acknowledges that the Jail is entitled to keep order, but one mentally ill inmate's resistance to having his clothes changed at that precise moment did not create a "severe security problem" for the Jail that warranted such an immediate escalation of force.

When Grant arrived in the changing room, Lewis was already on the floor. According to Sergeant Loboda, there were as many as nine Jail officers in that small room with Lewis, who was known to be schizophrenic but unquestionably was unarmed, in a small confined space, deep inside a secure jail facility surrounded by detention officers with no possibility of flight or escape. If Grant perceived that Lewis presented so severe a threat to her own safety or that of the other officers that it

was reasonable of her to stand on him with her entire body weight when he was on the floor on his stomach surrounded by other DSOs, then her perception was wholly unreasonable.

**e. Whether Lewis was Actively Resisting**

Plaintiff agrees that Lewis resisted the officer's attempts to change his clothes, but there is no valid reason that such lack of cooperation should have cost him his life. The Amended Custodial Death report has specific questions on the form, answered regarding Lewis, posed as "Did the decedent ....."

| | |
|---|---|
| Resist being handcuffed or arrested? | Yes |
| Attempt to Injure Others? | No |

(P. App. 78-79) (Amended Custodial Death Report)

Rational or not, all of the evidence suggests that Lewis was trying to get the officers to stop forcing him to change his clothes—he was trying to get the officers to leave him alone. Sgt. Loboda said in his statement that the incident began when he grasped Lewis's right arm, and Lewis "pulled away from me and curled into a ball." (P. App. 6) (Loboda Statement) There is not a shred of evidence to suggest that Lewis affirmatively attacked the officers to intentionally injure them.

Grant argues in her Brief that "Resisting being handcuffed constitutes active resistance and justifies the use of at least some force. *See Hutcheson*, 994 F.3d at 480 (citing *Collier v. Montgomery*, 569 F.3d 214, 219 (5th Cir. 2009))." That statement, and the case law she invokes, misses the point that Lewis was simply resisting changing his clothes. It was Grant's idea to put handcuffs on Lewis *after* the incident began.

The Fifth Circuit has noted that "we have placed weight on the quickness with which law enforcement personnel have escalated from negotiation to force." *Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016). Knowing that Lewis was mentally ill, the supervisor Sgt. Loboda made no

attempt to calm down Lewis and deescalate the situation, and Grant and the other DSOs followed his lead. Officer Sawyer told Detective Williams that Lewis "just didn't seem to be in his right mind." (P. App. 62) (Sawyer interview at 8/18-19) Sawyer had experience working in the west tower in the psych area, and she commented that "you have to be more patient and take more time to deal with those kind of people." (P. App. 65) (Sawyer interview at 17/13-17) Sawyer told Detective Williams, "personally, I think they could have talked to him a little bit more and maybe got him to comply." (P. App. 66) (Sawyer interview at 23/8-9) She said she thinks they could have taken more time instead of being so aggressive so quickly. (P. App. 70) (Sawyer interview at 35/5-12)

#### 2. Lewis's Fourteenth Amendment Right to be Free From the Use of Excessive Force Was Clearly Established at the Time of Grant's Misconduct

The second prong of the qualified immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Tolan*, 134 S. Ct. at 1866, *citing Hope v. Pelzer*, 536 U. S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002). Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope*, 536 U. S. at 739. The Supreme Court has explained that "officials can still be on notice that their conduct violates established law even in novel factual circumstances," and the Court has expressly rejected a requirement that previous cases be "fundamentally similar." *Id.* at 741.

The evidence from Tavera is that Grant stood on Lewis, using her entire body weight on him when he was on the floor, on his stomach, surrounded by officers. The Fifth Circuit has long denied qualified immunity for jail officials in similar situations. For example, in *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990) plaintiff Simpson was arrested and transported to the Cleveland, Texas city

jail. He exhibited signs of drug use and volatile behavior, and resisted being searched. He was put in a cell. Then,

> A struggle ensued, the details of which are in dispute. Defendants contend that Simpson violently resisted their efforts to search his pockets. To overcome his resistance, [Police Captain] Hines put his arm around Simpson's neck while the other officers grabbed Simpson's arms and legs. The officers forced Simpson to the floor and attempted to handcuff him while [Police Officer] Broussard, nicknamed "Beef" due to his large size, sat on Simpson's chest. Unable to restrain Simpson in this position, they rolled him on his stomach, cuffed his hands behind his back, and cuffed his legs.

*Simpson* at 402. Simpson ultimately died as a result of asphyxia from the trauma to his neck. The Fifth Circuit denied qualified immunity:

> Defendants' own reports indicate that ten officers entered Simpson's cell and collectively used physical force against him. Captain Hines admittedly placed Simpson in a neckhold and exerted sufficient pressure to subdue him. Broussard admittedly sat "astraddle him;" an investigatory report by the Texas Rangers more precisely placed Broussard on Simpson's chest. . . . Defendants claim that such force was necessary; plaintiffs counter that Simpson's screams and repeated cries for mercy are evident on the tape recording. Finally, the tape recording contains statements from which the trier-of-fact might infer malice. Viewing the record in the light most favorable to plaintiffs, we find ample evidence that the defendant officers who entered Simpson's cell reasonably should have known that in subduing and searching Simpson they maliciously used force which was grossly disproportionate to the need and was calculated to injure Simpson severely.

*Id.* at 403. As in *Simpson*, in this case Grant put her entire body weight on Lewis when he was in a vulnerable, prone position face down on the floor, with tragic consequences.

Viewing the record in the light favorable to Plaintiff, a jury could find that a reasonable officer would have concluded that Grant used excessive force on Lewis by placing her entire body weight on him in violation of his Fourteenth Amendment rights.

### B. At a Minimum, Genuine Issues of Material Fact Preclude Summary Judgment

As the Supreme Court determined in *Tolan*, "courts may not resolve genuine disputes of fact

in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. at 656. At a minimum, the evidence raises numerous genuine issues of material fact as to Grant's entitlement to qualified immunity, because her account is contradicted by another officer present in the room with no apparent motive to lie, and the fact that Lewis suffered injuries that were ultimately fatal immediately after her actions. "[A] motion for summary judgment cannot be defeated solely by conclusional allegations that a witness lacks credibility. Nevertheless, when the circumstances are conducive to lying, well-supported suspicion of mendacity may serve as a legitimate basis for the factfinder's reasonable inferences concerning the ultimate facts at issue." *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) (summary judgment for officer denied; Fifth Circuit determined that a reasonable jury could disbelieve the officer's testimony and find that he lacked probable cause for the arrest), *quoting Thomas v. Great Atl. & Pac. Tea Co.*, 233 F.3d 326, 331 (5th Cir. 2000) (footnote omitted). Summary judgment is not appropriate when "questions about the credibility of key witnesses loom . . . large" and the evidence could permit the trier-of-fact to treat their testimony with "skeptical scrutiny." *Deville*, 567 F.3d at 156, *quoting Thomas*, 233 F.3d at 331.

> The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to Tolan's competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

*Tolan v. Cotton*, 572 U.S. at 659. In this case, when the Court draws reasonable inferences from the evidence in favor of the non-movant Plaintiff, Grant is not entitled to summary judgment on qualified immunity.

## V. CONCLUSION

Plaintiff Sophia Lewis has produced ample competent summary judgment evidence to demonstrate that genuine issues of material fact exist with respect to Defendant Annette Grant's entitlement to qualified immunity for the claims against her. This evidence precludes summary judgment in favor of Defendant Grant. Plaintiff therefore asks the Court to deny Defendant Grant's Motion for Summary Judgment Asserting Qualified Immunity in its entirety, permit this case to proceed to trial on the merits, and for all other relief to which Plaintiff may be entitled. In the event, however, the Court concludes that Grant is entitled to qualified immunity at this stage of the proceedings, Plaintiff asks that the Court enter such ruling without prejudice, and permit Plaintiff to conduct limited discovery on the issue of Grant's qualified immunity, including by deposing the officers who were in the changing room with Lewis at the time in question.

Respectfully submitted,

**CLARK | VON PLONSKI | ANDERSON**

By: *R. Connor Barbe*
**COLLEN A. CLARK**
State Bar No. 04309100
**JACOB L. von PLONSKI**
State Bar No. 24098554
**R. CONNOR BARBE**
State Bar No. 24108598
**LINDA LE**
State Bar No. 24126312
3500 Maple Avenue, Suite 1250
Dallas, Texas 75219
214-780-0500
214-780-0501 Facsimile
Eservice – eservice@cvpalaw.com

*In association with:*

**THE PIPKIN LAW FIRM**

**STEPHEN C. PIPKIN**
State Bar No. 00784766
3500 Maple Avenue, Suite 1250
Dallas, Texas 75219
Telephone: 214-780-0512
Facsimile: 866-789-6956
Email – steve@pipkinlawfirm.com

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

This will certify that the foregoing document has been served upon the following counsel of record by electronic service via the Court's CM/ECF system in accordance with the FEDERAL RULES OF CIVIL PROCEDURE on the 19th day of July 2024.

JOHN CREUZOT CRIMINAL DISTRICT ATTORNEY DALLAS COUNTY, TEXAS
Joseph W. Spence, Assistant District Attorney
Jason G. Schuette, Assistant District Attorney
Dallas County Records Building
500 Elm Street, Suite 6300
Dallas, Texas 75202

**ATTORNEYS FOR DEFENDANTS DALLAS COUNTY, CHRISTOPHER LOBODA, JAMES MCDANIEL, JAVIER TAVERA-LUNA, ROCHELLE ROEMEN, AND FUQUAN CHILDRESS**

Edwin P Voss , Jr.
Brown & Hofmeister
740 E Campbell Rd., Suite 800
Richardson, Texas 75081

**ATTORNEY FOR DEFENDANT ANNETTE GRANT**

Winston L Borum
Watson Caraway Midkiff & Luningham LLP
306 W 7th Street, Suite 200
Fort Worth, TX 76102

**ATTORNEY FOR DEFENDANTS ADARIA JOHNSON, LVN, KELECHI NWAZUE, RN, CARMEN DAVIS, RN, AND YEWANDE WILSON, NP**

*/s/ R. Connor Barbe*
**R. Connor Barbe**