IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SOPHIA LEWIS, INDIVIDUALLY AND | § | |
| AS REPRESENTATIVE OF THE ESTATE | § | |
| OF SHAMOND LEWIS, DECEASED | § | |
| | § | |
| VS. | § | 3:23-CV-00381-D |
| | § | |
| DALLAS COUNTY; | § | |
| SERGEANT CHRISTOPHER LOBODO; | § | |
| OFFICER JAMES MCDANIEL; | § | |
| OFFICER JAVIER TAVERA-LUNA; | § | |
| OFFICER ROCHELLE ROEMAN; | § | |
| OFFICER ANNETTE GRANT; | § | |
| OFFICER FUQUAN CHILDRESS, ET AL | § | |

**BRIEF IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT ASSERTING QUALIFIED IMMUNITYOF DEFENDANTS ADARIA JOHNSON, LVN, KELECHI NWAZUE, RN, CARMEN DAVIS, NP, AND YEWANDE WILSON, NP**

Respectfully submitted,

/s/ *Winston L. Borum*

Winston L. Borum (02675500)
Watson, Caraway, Midkiff & Luningham, LLP
306 W. 7th Street, Suite 200
Fort Worth, Texas 76102
817.870.1717
Fax 817.338.4842
**WBorum@watsoncaraway.com**

Attorney for Defendants Adaria Johnson, LVN, Kelechi Nwazue, RN, Carmen Davis, RN, and Yewande Wilson, NP

## **Certificate of Service**

The undersigned certifies that this Brief in Support of Motions for Summary Judgment is being filed electronically in compliance with Local Rule CV-5(a). As such, this document is being served on all counsel who have consented to electronic service, Local Rule CV-5(a)(3)(A), on the date of e-filing.

/s/ *Winston L. Borum*
Winston L. Borum

# TABLE OF CONTENTS


**TABLE OF CONTENTS** .......... iii

**TABLE OF AUTHORITIES** .......... v

**I.** **Summary Judgment Standard** .......... 1

**II.** **The summary judgment record establishes that Movants are government health care employees entitled to qualified immunity** .......... 3

**III.** **Qualified Immunity Standards Generally** .......... 4

**IV.** **Qualified Immunity Standards in Medical Cases** .......... 5

**V.** **Plaintiff's Allegations Against Movants** .......... 8

- **A. Defendants' Motion for Rule 7(a) Reply, and the Court's Memorandum Opinion and Order Granting it** .......... 8
- **B. Plaintiff's Rule 7(a) Reply Allegations Against Movants** .......... 9

**VI.** **Primacy of Video Evidence and Contemporaneous Medical Records** .......... 9

**VII.** **Defendants' summary judgment evidence proves that they did not act with subjective deliberate indifference to deny constitutionally mandated medical care to Mr. Lewis, and Plaintiff cannot produce competent summary judgment evidence that they did** .......... 11

- **A. Rule 7(a) Reply allegation:** "Nurse Johnson failed to respond timely to the serious medical needs of Shamond Lewis, as it took her over five minutes and multiple requests and demands from the officers to respond to the medical needs of Lewis." .......... 12
- **B. Rule 7(a) Reply allegation:** "(Nurse Johnson, Nurse Nwazue, Nurse Davis, and Nurse Wilson) failed to timely provide Shamond Lewis with an automated external defibrillator, with knowledge of the serious medical needs of Shamond Lewis." .......... 21
- **C. Rule 7(a) Reply allegation:** "(Nurse Johnson, Nurse Nwazue, Nurse Davis, and Nurse Wilson) failed to timely provide Shamond Lewis with oxygen, with knowledge of the serious medical needs of Shamond Lewis." .......... 23
- **D. Rule 7(a) Reply allegation:** "(Nurse Johnson, Nurse Nwazue, Nurse Davis, and Nurse Wilson) failed to timely initiate the Chain of Command regarding

concerns of the serious medical needs of Shamond Lewis as paramedics were not called until 1:09:40 and did not arrive on scene until 1:19:07." ........................... **23**

**VIII. Causation** ........................................................................................................ **24**

**IX. Summary and Conclusion** ........................................................................... **25**

**X. Prayer** ......................................................................................................... **26**

**TABLE OF AUTHORITIES**

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), *cert. denied*, 502 U.S. 1048 (1992) ...... **2-3**

*Banuelos v. McFarland*, 41 F.3d 232 (5th Cir. 1995)........................................................**11**

*Beck v. Tex. State Bd. Of Dental Exam'rs*, 204 F.3d 629 (5th Cir. 2000)..............................**2**

*Brown v. Callahan*, 623 F.3d 249 (5th Cir. 2010).........................................................**1**

*Calhoun v. Hargrove*, 312 F.3d 730 5th Cir. 2002)........................................................**7**

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................................**2**

*Club Retro, LLC v. Hilton*, 568 F.3d 181 (5th Cir. 2009).............................................**1**

*Colston v. Barnhart*, 130 F.3d 96 (5th Cir. 1997) .........................................................**4**

*Dallas County Hospital Dist. v. Constantino*, 2014 Tex. App. LEXIS 8703 (Tex. App.—Dallas 2014, no writ)..............................................................................................**3**

*Doe v. Taylor Indep. Sch. Dist., et al.*, 15 F.3d 443 (5th Cir. 1994), *cert. denied*, 513 U.S. 815 (1994)..............................................................................................**4**

*Delaughter v. Woodall, et al., Delaughter v. Woodall, et al*, 909 F.3d 130 (5th Cir. 2018) ..........**6**

*Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752 (5th Cir. 2001) ..........................**5, 7, 25**

*Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869 (5th Cir. 1991) .....................................**2**

*Estelle v. Gamble*, 429 U.S. 97 (1976) ......................................................................**5, 6**

*Farmer v. Brennan*, 511 U.S. 825 (1994) ..................................................................**5, 6, 7**

*Fisher v. Dallas Cnty.*, 299 F.R.D. 527 (N.D. Tex., Apr. 18, 2014) (Fitzwater, C.J.)...............**8**

*Gates v. Tex Dep't of Protective & Regulatory Servs.*, 537 F.3d 404 (5th Cir. 2008)..............**1-2**

*Gibbs v. Grimmette*, 254 F.3d 545 (5th Cir. 2001)............................................................ **fn 2 p 5**

*Gobert v. Caldwell*, 463 F.3d 339 (5th Cir. 2006)..........................................................**7, 25**

*Graves v. Hampton*, 1 F.3d 315 (5th Cir. 1993) ...............................................................**6**

*Hall v. Thomas*, 190 F.3d 693 (5th Cir. 1999) ....................................................................**5**

See *Hall v. Trochessett*, 105 F.4th 335 (5th Cir. 2024)…………..………..…………………**fn 1 p 4**

*Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996) .................................................... **fn 2 p 7, 8**

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ..........................................................................**4**

*Harris v. Hegman*, 198 F.3d 153 (5th Cir. 1999).. ..................................................................**7**

*Haskew v. Wainwright*, 429 F.2d 525 (5th Cir. 1970). .............................................................**5**

*Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007)………………………………………………..**2**

*Helling v. McKinney*, 509 U.S. 25 (1993) ..............................................................................**7**

*Hightower v. Texas Hosp. Ass'n*, 65 F.3d 443 (5th Cir. 1995) ...................................................**2**

*Hilton v. Sw. Bell. Tel. Co.*, 936 F.2d 823 (5th Cir. 1991) (per curiam) .......................................**2**

*Jefferson v. Ysleta Indep. Sch. Dist.*, 817 F.2d 303 (5th Cir. 1987) …………….…..….......….**4**

*Johnson v. Treen*, 759 F.2d 1236 (5th Cir. 1985) ……….……………...……..…………..**5-6, 7**

*Kassen v. Hatley*, 887 S.W. 2d 4 (Tex. 1994) ........................................................................**3**

*Latimer v. Smithkline & French Labs.*, 919 F.2d 301 (5th Cir. 1990) ..........................................**1**

*Lawson v. Dallas County*, 286 F.3d 257 (5th Cir. 2002) ...........................................................**7**

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) ........................................................ **1, 2**

*Lujan v. Na'tl Wildlife Fed'n*, 497 U.S. 871 (1990) ................................................................**2**

*Mendoza v. Lynaugh*, 989 F.2d 191 (5th Cir. 1993) ................................................................**6**

*McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002) (en banc) (per curiam)……………**2**

*McCord v. Maggio*, 910 F.2d 1248 (5th Cir. 1990) ...............................................................**11**

*Munoz v. Orr*, 200 F.3d 291 (5th Cir. 2000) ..........................................................................**2**

*Murray v. Earle*, 405 F.3d 278 (5th Cir. 2005) ....................................................................**24**

*Norton v. Dimazana*, 122 F.3d 286 (5th Cir. 1997) ..................................................................**6**

*Reeves v. Collins*, 27 F.3d 174 (5th Cir. 1994) ......................................................................**7**

*Savoy v. Stroughter*, 2024 WL 1756093 (5th Cir. 2024)....................................**11**

*Scott v. Dallas County Hospital District*, 2010 WL 7138 (N.D. Tex. 2010)...........................**3**

*Scott v. Harris*, 550 U.S. 372 (2007).........................................................**10, 11**

*Sligh v. City of* Conroe, 87 F.4th 290 (5th Cir. 2023)..........................................**11**

*Stewart v. Murphy*, 174 F.3d 530 (5th Cir. 1999) ..........................................................**5, 6, 7**

*Tarrant County Hosp. Dist. v. Ray*, 712 S.W.2d 271, (Tex. App.—Fort Worth 1986, writ ref'd n.r.e.)................................................................................**3**

*Vernando v. Lynaugh*, 920 F.2d 320 (5th Cir. 1991).................................................**7**

*Weatherspoon v. Dallas County Medical Department*, 2006 WL 1234825 (N.D. Tex 2006) ........**4**

*Young v. Gray*, 560 F.2d 201 (5th Cir. 1977) . .....................................................................**6**

**RULES**

F.R.Civ.P. 56 ..........................................................................................................**1, 2**

**STATUTES**

42 U.S.C. § 1983 ...................................................................................................**1, 4, 24**

**UNITED STATES CONSTITUTION**

Eighth Amendment ....................................................................................................**5, 6, 7**

Fourteenth Amendment .........................................................................................**fn 2 p 5, 25**

**BRIEF IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT ASSERTING QUALIFIED IMMUNITYOF DEFENDANTS ADARIA JOHNSON, LVN, KELECHI NWAZUE, RN, CARMEN DAVIS, NP, AND YEWANDE WILSON, NP**

TO THE SAID HONORABLE COURT:

COME NOW Adaria Johnson, LVN ("LVN Johnson"), Kelechi Nwazue, RN ("RN Nwazue"), Carmen Davis, NP ("NP Davis"), and Yewande Wilson, NP (”NP Wilson"), pursuant to Fed. R. Civ. Proc. 56, and submit this Brief in Support of their Motions for Summary Judgment Asserting Qualified Immunity (MSJ). At the time of their involvement in Shamond Lewis's healthcare Defendants were employees of the governmental entity Dallas County Hospital District d/b/a Parkland Health (DCHD/Parkland). They were acting within the course and scope of that employment, in its Correctional Health Division in the Dallas County Jail, and in good faith have asserted their rights to qualified immunity from Plaintiff's allegations against them. (Dkt 55, p 20.)

Specific references to the Appendix to Motions for Summary Judgment of these "Parkland Defendants" will be cited as ("Appx").

## I.
## Summary Judgment Standard

Summary judgment is appropriate when the pleadings and the record of competent summary judgment evidence show that no genuine issue of material fact exists, and that movant is entitled to judgment as a matter of law. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994). In most cases, the burden is on movant to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). However, when governmental employees assert qualified immunity in good faith in a 42 USC § 1983 action, the burden is on the plaintiff to rebut that defense. See *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010); *Club Retro, LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009); *Gates v. Tex Dep't of*

*Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008); *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007); *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam). Although Defendants/Movants herein are supporting their MSJ with a wealth of competent evidence, governmental employees asserting qualified immunity do not actually have a burden to do so. *Beck v. Tex. State Bd. Of Dental Exam'rs*, 204 F.3d 629, 633-34 (5th Cir. 2000).

To avoid summary judgment in this case, Plaintiff must show that summary judgment is not appropriate. See *Little*, 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 [1986]). The non-movant must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp*., 477 U.S. at 324 (citing Fed. R. Civ. P. 56). A party opposing a summary judgment motion cannot rest on mere conclusory allegations or denials in her pleadings unsupported by specific facts presented in affidavits opposing the summary judgment motion. See Fed. R. Civ. P. 56(e); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Hightower v. Texas Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995). In determining whether a genuine issue exists for trial, the court must view the evidence in the light most favorable to the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). But if the non-movant fails to establish a genuine issue of material fact as to every essential element of her claim, summary judgment is mandated as to that claim. *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 872 (5th Cir. 1991) (quoting *Celotex Corp*., 477 U.S. at 322).

"A dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Hilton v. Sw. Bell. Tel. Co.*, 936 F.2d 823, 827 (5th Cir. 1991) (per curiam) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986),

*cert. denied*, 502 U.S. 1048 (1992)). "'Material facts' are 'facts that might affect the outcome of the suit under the governing law.'" *Id.* Plaintiff cannot satisfy either requirement.

**II.**
**<u>The summary judgment record establishes that Movants are government health care employees entitled to qualified immunity.</u>**

All Defendants have pled, *inter alia*, the defense of qualified immunity. (Dkt 55, p 20). As their affidavits establish, at all times in question each was acting within the course and scope of their employment with the Dallas County Hospital District d/b/a Parkland Health (DCHD/Parkland) and assigned to its Correctional Health Division: NP Wilson (Appx, pp 0027, 0050); LVN Johnson (Appx, pp 0055, 0075); RN Nwazue (Appx, pp 0078-79, 0083); and NP Davis (Appx, pp 0087, 0096). DCHD/Parkland is a governmental entity: a hospital district, which is a political subdivision of the State of Texas created and existing pursuant to Texas Constitution Article IX § 4, and Texas Health & Safety Code §281.002, 0282. See *Kassen v. Hatley*, 887 S.W.2d 4, 13 (Tex. 1994); *Dallas County Hospital Dist. v. Constantino*, 2014 Tex. App. LEXIS 8703,*5 (Tex. App.—Dallas 2014, no writ); *Scott v. Dallas County Hospital District*, 2010 WL 7138 *6 (N.D. Tex. 2010); and *Tarrant County Hosp. Dist. v. Ray*, 712 S.W.2d 271, 273-74 (Tex. App.—Fort Worth 1986, writ ref'd n.r.e.) ("hospital district" held to be a "local unit of government" for purposes of the Texas Tort Claims Act).

Adaria Johnson is a Licensed Vocational Nurse, working the night shift out of the Second Floor Nursing Station of the South/Kays Tower of the Lew Sterrett Justice Center. (Appx, p 0055.) Yewande Wilson is a Nurse Practitioner, working the night shift out of that nursing station as an Advance Practice Provider. (Appx, pp 0027-28.) Carmen Davis is a Nurse Practitioner, also working the night shift out of that nursing station as an Advance Practice Provider. (Appx, pp 0088-89.) Kelechi B. Nwazue is a Registered Nurse, working the night shift as charge nurse in the

Adult Psychiatric Unit on the third floor, who responded to the second floor in response to the Man Down call. (Appx, pp 0078-79.) Defendants' professional education, training, and experience is set out in their Affidavits: NP Wilson (Appx, pp 0026-28); LVN Johnson (Appx, pp 0054-55); RN Nwazue (Appx, pp 0078-79); and NP Davis (Appx, pp 0086-88).

## III.
## Qualified Immunity Standard Generally

In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court established an objective test for determining if an official has qualified immunity from a 42 U.S.C. § 1983 claim.[1] Under this test, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. See *also*, *Jefferson v. Ysleta Indep. Sch. Dist.*, 817 F.2d 303 at 305 (5th Cir. 1987). The defense of qualified immunity protects a public official from liability in the performance of her duties unless she violates a clearly established statutory or constitutional right of another that was known or would be knowable by a reasonable person. For a right to be "clearly established," it must be sufficiently clear that a reasonable official would understand that what she is doing violates that right. *Doe v. Taylor Indep. Sch. Dist., et al.*, 15 F.3d 443 at 455 (5th Cir. 1994), *cert. denied* 513 U.S. 815 (1994). The bifurcated test for qualified immunity is (1) whether the Plaintiff has alleged a violation of a clearly established constitutional right; and (2) if so, whether a defendant's conduct was objectively unreasonable in the light of clearly established law at the time of the incident. *Colston v. Barnhart*, 130 F.3d 96 at 99 (5th Cir. 1997); see also, *Weatherspoon v. Dallas County Medical Department*, 2006 WL 1234825 (N.D. Tex. 2006). As will be discussed in the next

---

[1] The Fifth Circuit has been urged to discontinue the defense of qualified immunity as a "legal fiction," but has consistently and recently denied that invitation. See *Hall v. Trochessett*, 105 F.4th 335, 344-45 (5th Cir. 2024).

paragraph, in medical cases the "objectively unreasonable" standard for deliberate indifference to establish a violation of a detainee's clearly established right to medical care requires *subjective* knowledge and indifference.

**IV.**
**<u>Qualified Immunity Standard in Medical Cases</u>**

Although the Eighth Amendment does not explicitly so mandate, Movants acknowledge that its "cruel and unusual punishment" clause has been interpreted to impose a duty on prison officials to provide inmates with a certain level of medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir. 1999).[2] A prison health care provider's "deliberate indifference" to the serious medical needs of a prisoner can constitute the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 754 (5th Cir. 2001). However, federal courts will not inquire into the adequacy or sufficiency of medical care of inmates unless prison officials appear to have abused the broad discretion they possess in this area. *Haskew v. Wainwright*, 429 F.2d 525, 526 (5th Cir. 1970). Mere negligence, neglect, or medical malpractice do not rise to the level of a constitutional violation. *Domino*, 239 F.3d at 756; *Hall v. Thomas*, 190 F.3d 693, 697 (5th Cir. 1999) ("[A]llegations of malpractice or negligence will never state a claim under the Eighth Amendment"); *Stewart*, 174 F.3d at 534.

As the court in *Domino* stated, "deliberate indifference is an extremely high standard to meet." For example, incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. *Domino*, 239 F. 3d at 756. See also, *Johnson v. Treen*, 759 F.2d

[2] Lewis's status as a pre-trial jail detainee rather than a convicted inmate is not relevant to this analysis, because it has been held that the Eighth Amendment right to a certain level of medical care (not to be denied treatment for a subjectively known serious medical need with deliberate indifference) has been found to apply to pre-trial detainees through the Fourteenth Amendment. *Cope v. Cogdill*, 3 F.4th 198, 206 (5th Cir. 2021); *Hare v. City of Corinth*, 74 F. 3d at 638-39, 647 (5th Cir. 1996. *See also Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001).

1236, 1238 (5th Cir. 1985). A plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id*. (emphasis added). For example, "… the question whether an x-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of medical judgment. A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act." *Estelle*, 429 U.S. at 107 (emphasis added). Even the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838. In *Mendoza v. Lynaugh*, 989 F.2d 191 (5th Cir. 1993), the Court upheld the trial court's dismissal of the inmate Plaintiff's claims for allegedly delayed medical care (which he said he badly needed for his back), noting from review of the medical records that he had in fact received ongoing treatment for his back (which he disagreed with). *Id.* at 193. "Further, delay in medical care can only constitute an Eight Amendment violation if there has been deliberate indifference, which results in substantial harm." *Id.* at 195. See also *Delaughter v. Woodall, et al*, 909 F.3d 130, 138 (5th Cir. 2018) ("Delaughter's claim arises from the fact he has yet to receive a prescribed course of treatment [hip replacement surgery]; it does not arise from his subjective opinion of the sufficiency of his medical treatment that is either contradicted or unsupported by medical professionals.")

Disagreement with medical treatment does not amount to an Eighth Amendment violation. *Stewart*, 174 F.3d at 537; *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997); *Graves v. Hampton*, 1 F.3 315, 319-20 (5th Cir. 1993); *Young v. Gray*, 560 F.2d 201 (5th Cir. 1977). "Rather, the plaintiff must show that the official 'refused to treat him, ignored his complaints, intentionally

treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Domino*, 239 F.3d at 756 (quoting *Johnson*, *supra*, 759 F.2d at 1238) (emphasis added).

Unsuccessful medical treatment does not rise to the level of deliberate indifference. *Vernando v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). Exceptional circumstances are required for a defendant's knowledge of a substantial risk of harm to be inferred by the obviousness of a risk. *Farmer*, 511 U.S. at 842; *Harris v. Hegman*, 198 F.3d 153, 159 (5th Cir. 1999); *Reeves v. Collins*, 27 F.3d 174, 176 (5th Cir. 1994).

An Eighth Amendment claim consists of two components, one objective and one subjective. *Farmer*, 511 U.S. at 839. To satisfy the objective requirement, a plaintiff must prove that he was exposed to a substantial risk of serious harm. *Id.* at 834; *Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir. 2002). Substantial risk of serious harm has been defined as a harm that is "…so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). Plaintiff must also demonstrate that Defendants were deliberately indifferent to that risk. See *Farmer*, 511 U.S. at 834; *Lawson*, 286 F.3d at 262.

The deliberate indifference standard in medical cases is a **subjective** inquiry. A plaintiff must establish that defendant was not only aware of facts from which an inference of a serious medical need and substantial risk of harm could be drawn, but that defendant actually subjectively came to that conclusion and chose to be indifferent. *Stewart*, 174 F.3d at 533-34; *Hare v. City of Corinth*, 74 F. 3d 633, 648 (5th Cir. 1996) (en banc); *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006); see also *Farmer*, 511 U.S. at 837, 840-41; *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002)

## V.
## Plaintiff's Allegations Against Movants

### A. Defendants' Motion for Rule 7(a) Reply, and the Court's Memorandum Opinion and Order Granting It

Plaintiff's "operative" pleading is still Plaintiff's Fifth Amended Complaint. (Dkt 32.) However, on October 23, 2024, this Court found that pleading to be inadequate as to Movants and granted Defendants' Motion for Rule 7(a) Reply (Dkt 60) by Memorandum Opinion and Order (MO&O) requiring Plaintiff to file a Rule 7(a) Reply (Dkt 98, p 23). In its MO&O, the Court said that Lewis's allegations (against these four Movants) "describe mostly conclusory allegations not assigned to any specific Medical Provider and fail to plead any conduct by any particular Medical Provider that allegedly violated Shamond's constitutional rights," and that this "'failure to attribute conduct to any of the [Medical Providers] makes it impossible to determine whether the defendant in question acted in an objectively unreasonable manner in light of clearly established constitutional standards,'" quoting *Fisher v. Dallas Cnty.*, 299 F.R.D. 527, 532-33 (N.D. Tex., Apr. 18, 2014) (Fitzwater, C.J.) (other citations omitted here). (Dkt 98, p 9.)

Based on this ruling, we must look to the allegations of Plaintiff's Rule 7(a) Reply as to each individual Movant in examining whether or not there is a genuine issue of material fact that would defeat each Defendant's assertion of qualified immunity. Defendants will now show that an analysis of the summary judgment evidence establishes that there are no such genuine issues of material fact.

### B. Plaintiff's Rule 7(a) Reply Allegations Against Movants

On November 20, 2024 Plaintiff filed her Rule 7(a) Reply to Defendants Adaria Johnson, LVN, Kelechi Nwazue, RN, Carmen Davis, RN, and Yewande Wilson, NP's Answer. (Dkt 101.)

It alleges that Adaria Johnson, LVN acted with deliberate indifference to Mr. Lewis's need for medical care in the following respects:

> *Nurse Johnson failed to respond timely to the serious medical needs of Shamond Lewis, as it took her over five minutes and multiple requests and demands from the officers to respond to the medical needs of Lewis.
>
> *Nurse Johnson failed to timely provide Shamond Lewis with an automated external defibrillator, with knowledge of the serious medical needs of Shamond Lewis.
>
> *Nurse Johnson failed to timely provide Shamond Lewis with oxygen, with knowledge of the serious medical needs of Shamond Lewis.
>
> *Nurse Johnson failed to timely initiate the Chain of Command regarding concerns with the serious medical needs of Shamond Lewis as paramedics were not called until 1:09:40 and did not arrive on the scene until 1:19:07.

(Dkt 101, p 6.) The allegations against Yewande Wilson, NP, Keleche Nwazue, RN, and Carmen Davis, NP are verbatim identical to those alleged against LVN Johnson, except that the first allegation is not asserted against Wilson, Nwazue, and Davis. Defendants will address the allegations in order, demonstrating that Plaintiff cannot raise genuine issues of material fact that would negate Defendants' entitlement to dismissal with prejudice on the ground of qualified immunity.

## VI.
## Primacy of Video Evidence and Contemporaneous Medical Records

Defendants have submitted a CD-ROM of the Closed Circuit Television (CCTV) videos (Appx, Exhibit 2, DVD, hand-delivered to the Court) of the occurrence and the conduct of these Defendants, taken by Sheriff Department surveillance cameras showing the hallway just outside of the second floor nursing station and the area inside the nursing station itself. These videos cover the time that Corrections Officers (COs) Loboda and Tavera wheeled Shamond Lewis in a restraint

chair to the area outside of the Second Floor Nursing Station, through the time his condition worsened and LVN Johnson assessed him in the hallway and summoned NP Wilson to help, and the Man Down was called resulting in a response from other medical providers within the Jail (including Nwazue and Davis), while Lewis was removed from the restraint chair and brought into the Second Floor Nursing Station and placed on a floor mat for CPR, then the resuscitation efforts by Correctional Health personnel through the time that the EMTs arrived and took over and transported Lewis to Parkland Hospital. (Appx, Exhibit 2.) Those CCTV videos, coupled with Defendants' affidavits describing them in detail, are dispositive of Defendants' entitlement to qualified immunity. Plaintiff may not raise a fact issue by contradicting what is shown in the CCTV videos by attempting to argue differing characterizations of the events—including hearsay investigative statements by Sgt Loboda and/or DSO Tavera, or double/triple hearsay investigation reports giving supposed observations and opinions by them or by others about what happened.

In *Scott v. Harris*, 550 U.S. 372 (2007), Plaintiff sued for severe injuries caused by a county deputy's running him off the road to terminate a high-speed pursuit initiated by Plaintiff's fleeing an attempted traffic stop. The trial court denied the deputy's qualified immunity based on qualified immunity, because the parties had differing versions of the events. The U.S. Supreme Court granted writ, and reversed and rendered in favor of the deputy, relying on videotape evidence.

> In qualified immunity cases, this usually means adopting (as the Court of Appeals did here) the plaintiff's version of the facts.
>
> There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question…. The videotape quite clearly contradicts the version of the story told by (Plaintiff) and adopted by the Court of Appeals.

*Id* at 378.

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether (Plaintiff) was driving in such a fashion as to endanger human life…. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

*Id* at 3780-81. See also *Sligh v. City of* Conroe, 87 F.4th 290, 298 (5th Cir. 2023); *Savoy v. Stroughter*, 2024 WL 1756093 *14 (5th Cir. 2024) (not designated for publication) ("Because Plaintiff's version of events is belied by the video, she failed to identify evidence creating a genuine dispute of material fact [citing *Scott*] and failed to carry her summary judgment burden with respect to the need for an application of force.")

Defendants have also submitted the relevant contemporaneous DCHD/Parkland Correctional Health medical records. (Appx, Exhibit 1, pp 0003-21.) Courts have held that medical records of treatment (sick calls, examinations, diagnoses, and medications) may rebut an inmate's claims of deliberate indifference. *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *McCord v. Maggio*, 910 F.2d 1248, 1251 (5th Cir. 1990).

## VII.
## Defendants' summary judgment evidence proves that they did not act with subjective deliberate indifference to deny constitutionally mandated medical care to Mr. Lewis, and Plaintiff cannot produce competent summary judgment evidence that they did.

All of Plaintiff's claims are disproved by the summary judgment evidence filed simultaneously "under seal" in the Appendix to Motions for Summary Judgment of Parkland Defendants which consists of: pertinent contemporaneous DCHD/Parkland Correctional Health medical records (Appx, pp 0003-0021); Dallas County Jail Closed Circuit TV videos dated September 23, 2022 showing the events in question from camera located in the hallway just outside the Second Floor Nursing Station ("Hallway Camera") and the camera inside the nursing station ("Inside Camera") (Appx, pp 0022-0024, DVD hand-filed with the Court); Affidavit of Yewande Wilson, NP (Appx, pp 0025-0052); Affidavit of Adaria Johnson, LVN (Appx, pp 0053-0076);

Affidavit of Kelechi Nwazue, RN (Appx, pp 0077-0084); and Affidavit of Carmen Davis, NP (Appx, pp 0085-0097). Movants' affidavits include very detailed descriptions of the events seen from the two CCTV video cameras. The Affidavits of LVN Johnson and NP Wilson give the most detailed and comprehensive descriptions of what can be seen happening, from the beginning to the end of Movants' involvement with inmate Lewis. It is clear from this evidence that Movants were not deliberately indifferent to Mr. Lewis's serious medical needs and that they did not ignore his complaints, refuse to treat him, show wanton disregard for a serious medical condition, or intentionally treat him incorrectly.

The two CCTV views, which show what happened in the hallway just outside and what happened inside the Second Floor Nursing Station of the Kays/South Tower of the Dallas County Jail when Mr. Lewis was there, blatantly contradict Plaintiff's allegations against Defendants. Movants will now respond to and unequivocally negate Plaintiff's Rule 7(a) allegations, as they explain in their affidavits what is shown by the Hallway and Inside CCTV camera videos at the nursing station where the events took place.

**A. Rule 7(a) Reply allegation**: "<u>Nurse Johnson failed to respond timely to the serious medical needs of Shamond Lewis, as it took her over five minutes and multiple requests and demands from the officers to respond to the medical needs of Lewis</u>." (Dkt 101, p 6.)

**<u>Hallway Camera video</u>:**

<u>Johnson Affidavit</u>: **"**Starting with the video of the Outside Camera CCTV video of the hallway outside the Second Floor Nursing Station ('Hallway Camera,' stamped as 'Camera5_DVR8_2022092301[4]') (Appx, Exhibit 2, hand-filed with the Court and Court Clerk), we see Sgt Loboda and DSO Tavera, bring Mr. Lewis to the hallway outside the nursing station door at time-stamp **01:03:57**. Sgt Loboda is seen pushing Mr. Lewis in the

restraint chair, while DSO Tavera is seen carrying the bag of Mr. Lewis's belongings and placing it on the floor next to the restraint chair. They do not bring him directly into the nursing station. They park him in the hallway to one side of the nursing station. At that time Mr. Lewis is seen moving his head, arm, and leg, and both officers are seen leaving him alone there and walking into the nursing station at time-stamp **01:04:08**. Mr. Lewis continues to move his head, arm and right leg. Sgt Loboda comes back into the hallway at **01:04:23** carrying something that he puts onto the property bag next to the restraint chair. At **01:04:30** Sgt Loboda goes back into the nursing station, at which time Mr. Lewis is still alone and seen continuing to move around in the restraint chair." (Johnson Affidavit, Appx, pp 0058-59; see also Wilson Affidavit, Appx, pp 0032-33.)

Johnson Affidavit: "At Hallway Camera CCTV time-stamp **01:05:08** Sgt Loboda can be seen coming back out of the nursing station carrying a cup of water. He notices that Mr. Lewis's right leg had come out the restraint chair strap, and he sets the cup on the floor, and he tries to secure the leg back in the strap. While he does this, Mr. Lewis moves his head and body around apparently trying to prevent this. Another CO, whose name I can't recall, followed Sgt Loboda from inside the nursing station into the hallway and stands next to Sgt Loboda. At **01:05:59** Sgt Loboda tries to give Mr. Lewis the water, but Mr. Lewis keeps moving his head around. At **01:06:15** it appears that Mr. Lewis is accepting the water, while two COs from the desk across the hallway from the nursing station look on. This is still occurring through **1:07:55**." (Johnson Affidavit, Appx, p 0059; see also Wilson Affidavit, Appx, p 0033.)

Johnson Affidavit: "At **01:07:59** Sgt Loboda puts the cup on the floor at **01:08:05**, and goes back into the nursing station as the female CO assigned to our nursing station that

night comes out for about 10 seconds, holding some papers. At **01:08:38** I enter the hallway, with Sgt Loboda following me. This is the first time I encountered Mr. Lewis during this incarceration." (*Id*.)

Johnson Affidavit: "I can be seen rolling vital signs stand and I try to take vital signs. I could tell that something wasn't right, because Mr. Lewis wouldn't respond to verbal stimuli. I touched him to see if he was arousable. His breathing was abnormal, but he was still breathing. According to the Man Down Response Form, at that point 'vital signs were unable to be able to be obtained' (by me) (Appx, p 0020). I ask the COs to get NP Wilson to come see the patient asap, and the female CO did so." (Johnson Affidavit, Appx, pp 0059-60; see also Wilson Affidavit, Appx, p 0033.)

Johnson Affidavit: "NP Wilson came into the hallway at time-stamp **01:09:20**. She could also see that Mr. Lewis was breathing but not arousable. As the video shows, she went back into the nursing station to glove up, while I remain with the patient and continue assessing him. NP Wilson comes back to the hallway at **01:10:00**, re-checks the patient, and tells the officers to take Mr. Lewis out of the restraint chair and get him into the clinic and send out a Man-Down call over their radio system. The officers are seen bringing Mr. Lewis into the nursing station at **01:10:35** per the Hallway Camera (which is 01:04:40 per the Inside Camera, showing that their time-stamps are about 6 minutes out of sync), and they put Mr. Lewis on the mat on the floor." (Johnson Affidavit, Appx, p 0060; see also Wilson Affidavit, Appx, p 0034.)

**Inside Camera video:**

Johnson Affidavit: "Backing up in time and now looking through the "Inside Camera" (identified as

"Camera6_DVR10_DVR10_20220923005700_20220923013759_1_G") (Appx, Exhibit 2, and hand-filed with the Court and Court Clerk), at time-stamp **<u>00:57:00</u>**, we see Olabasi Akomolafe, LVN sitting at her work station on the left, facing her computer that faces her away from the door. I am sitting at my work station and computer in the middle of the nursing station, which faces toward the open treatment room. On the far right side of the nursing station, near the door, sits the other of the two Corrections Officers assigned to be in the Second Floor Nursing Station for that night shift, a Black gentleman." (Johnson Affidavit, Appx, p 0060; see also Wilson Affidavit, Appx, p 0034-35.)

<u>Jonson Affidavit</u>: "The first part of the Inside Camera video overlaps with what I have described from the Hallway Camera. We see Sgt Loboda and DSO Tavera bringing Lewis down the hallway in the restraint chair toward the nursing station and then they park him in the hallway to the left, out of view of the nursing station. On the Inside Camera this arrival is time-stamped as **<u>00:57:53</u>**. (On the Hallway Camera, this is time-stamped at 01:03:56. This, and other comparisons, confirm that the Hallway Camera time-stamp was running about 6 minutes ahead of the Inside Camera time-stamp.)" (Johnson Affidavit, Appx, pp 0060-61; see also Wilson Affidavit, Appx, p 0035.)

<u>Johnson Affidavit</u>: "At **<u>00:58:32</u>** DSO Tavera (wearing a white mask) comes into the nursing station and walks over to the male CO assigned to our nursing station for that night shift, who is seated in a chair on the right side of the nursing station. They fist-bump each other, and visit. DSO Tavera says nothing to me or to anyone else.)" (Johnson Affidavit, Appx, p 61; see also Wilson Affidavit, Appx, p 0035.)

<u>Johnson Affidavit</u>: "At **<u>00:58:35</u>** Sgt Loboda is seen walking into the nursing station from the hallway following DSO Tavera, entering the open room to his right,

coming out with a cup of water, and going back to the hallway at **00:59:02**. He does not appear to have said anything to any of the nurses, including myself, during that time, and I do not remember him doing so. DSO Tavera fist-bumps the seated DSO again, and walks back into the hallway at **00:59:48**, still without having spoken with any of the nurses.)" (Johnson Affidavit, Appx, p 0061; see also Wilson Affidavit, Appx, p 0035.)

Wilson Affidavit: "While all of this is happening, LVN Johnson and Olabisi Akomolafe, LVN are still at their work stations. Given the time of shift, they would have recently finished their cell side 'medication passes' and their clinic 'KOP' medication hand-outs to the inmates on our floor. It is obvious from the video that neither of them have been told that that there was an inmate in the hallway who needed to be seen urgently." (Wilson Affidavit, Appx, p 36.)

Johnson Affidavit: "At **01:00:44** a male CO comes near the entrance of the nursing station and appears to say something. I don't recall exactly what he said, but at that point I can be seen putting on gloves while now speaking with the female nursing station CO, who copies a paper, apparently Mr. Lewis's buff card, and gives it to me at **01:01:36**. I go back to my work station, obviously to look up the new inmate on my computer. At **01:02:10** Sgt Loboda re-enters the nursing station, and at **01:02:17** he comes to my work station to speak with me. This is when he told me something to the effect of 'we have a guy in a restraint chair, and we had to fight him.' I get a rolling vital signs machine, and at **01:02:32** I am seen following Sgt Loboda into the hallway (an event time-stamped 1:08:40 on the Hallway Camera video). This is the normal kind of interaction we see when a CO brings any new inmate to MAP after completion of his book-in process. I would normally take a new inmate's vital signs, check his restraints, ask him about his medical history such as

medication/drug use, history of diabetes, etc.” (Johnson Affidavit, Appx, pp 0061-62; see also Wilson Affidavit, Appx, p 0036.)

Johnson Affidavit: “What happens when I enter the hallway with the rolling vital signs machine, and what happens from then until Mr. Lewis is brought into the nursing station, is shown in the Hallway Camera as I have already described above. I was unable to obtain vital signs. Mr. Lewis did not speak to me, and I could not arouse him. He was still breathing, but with some trouble. I asked one of the COs to get my Nurse Practitioner, NP Wilson.” (Johnson Affidavit, Appx, p 62.)

Johnson Affidavit: “At time-stamp **01:03:03** on the Inside Camera, the female CO walked back into the nursing station, which I had requested, and hollered in the direction of NP Wilson’s office while signaling ‘come here’ with her hand. NP Wilson did so, and at Inside Camera time-stamp **01:03:06** she can be seen hurrying out of her office to go to the hallway, where I am with the patient. At that time, Mr. Lewis was still breathing, but now was not arousable. NP Wilson can be seen coming back into the nursing station at **1:03:39** to glove up and saying something to LVN Akomolafe (who proceeded to put on a mask and gloves), then NP Wilson went back into the hallway at **1:03:54**, re-checked the patient, and told the officers to take him inside and take him out of the restraint chair and put him on the floor mat, and to call a “Man-Down” to bring available Correctional Health personnel to our location.” (Johnson Affidavit, Appx, p 0062; see also Wilson Affidavit, Appx, pp 0036-37.)

Johnson Affidavit: “The officers are seen wheeling Mr. Lewis, still in his restraint chair, into the nursing station at **01:04:40** per the Inside Camera time-stamp. CPR was initiated as soon as Mr. Lewis was placed on the mat. My Man Down Response Form says

'LVN Akomolafe checked for pulse in R carotid, which was absent.' (Appx, p 0020.) My Man Down Response Form says that 'Compressions began @**0106**' (Appx, p 0020). As far as the Man Down Response Form times are concerned, we have to keep in mind that I filled out that electronic record when the code was almost over and I had the time to do so. What IS clear from the video is that there was no delay in starting CPR once the COs got Mr. Lewis out of the restraint chair and placed him on the mat." (Johnson Affidavit, Appx, pp 0062-63; see also Wilson Affidavit, Appx, p 0037.)

Johnson Affidavit: "Members of the Correctional Health nursing staff already at the Second Floor Nursing Station initiated CPR, and in response to the Man Down call additional CH personnel begin arriving from other locations. We had adequate Correctional Health personnel to perform this code. Sgt Loboda and DSO Tavera also took turns doing chest compressions. That kind of help is always welcome if they can do it correctly, which they did. Doing chest compressions is hard work." (Johnson Affidavit, Appx, p 63; see also Wilson Affidavit, Appx, p 0037.)

Johnson Affidavit: "Any suggestion that the Correctional Health personnel at the Second Floor Nursing Station did not respond timely when we learned of Mr. Lewis's emergent condition, or that we were not prepared to treat Mr. Lewis's unexpected emergent condition, is unfounded. Sgt Loboda and DSO Tavera did not wheel Mr. Lewis directly into the nursing station upon arrival, as they could have been if the inmate were in medical trouble. The Inside Camera CCTV video shows that they did not immediately announce that an inmate they had put in the hallway was having trouble breathing and was becoming unresponsive. Instead, they left him in the hallway and came inside—Sgt Loboda to get him a cup of water and DSO Tavera to visit with someone seated in the nursing station,

then they went back to the hallway to secure the inmate's restraint chair leg strap and try to give him the water. After all of that, when I went into the hallway to take Mr. Lewis's vital signs for his MAP visit and saw that he was having consciousness and then breathing issues, I did not ignore him or his condition or refuse nursing care to him. After my initial assessment I told the COs to get NP Wilson, which they did. NP Wilson responded promptly and also assessed Mr. Lewis, and she told them to bring him inside the nursing station to begin CPR and call for the Man Down response." (Johnson Affidavit, Appx, pp 0063-64.)

Wilson Affidavit: "Did LVN Johnson fail to respond timely? The Inside and Outside Camera CCTV videos show that this did not happen. Also … [i]f Sheriff's Department personnel had observed a serious medical condition of Mr. Lewis necessitating immediate medical attention, prior to or upon their arriving with him in the hallway outside the Second Floor Nursing Station, they would have known not park his restraint chair in the hallway outside the nursing station to get him water or to secure a leg restraint or for any other reason. A serious medical condition, such as difficulty breathing or becoming unresponsive, would require—even to laymen—that they immediately wheel Mr. Lewis directly into the nursing station and urgently seek medical attention for him from the Correctional Health personnel available there. The CCTV video shows they did not do that, so my opinion as a nurse practitioner must be that the jailers did not observe a serious condition that they felt required urgent medical attention while Mr. Lewis was sitting in the restraint chair out in the hallway. If such a change in condition had occurred at any time before then, the jailers would have known to wheel Mr. Lewis directly into the nursing station and cry out for help." (Wilson Affidavit, Appx, p 0047-48.)

Reviewing what is described above: as documented by the Inside Camera CCTV video, from the time Sgt Loboda walked into the nursing station the first time at **00:58:35** (when he and DSO Tavera obviously did not summon any nurses into the hallway) until the time Nurse Johnson entered the hallway to see Mr. Lewis at **01:02:32** (after gloving up, obtaining a copy of Mr. Lewis's buff card, looking Mr. Lewis up on the Correctional Health electronic medical record [CH EMR]), was **3 minutes and 57 seconds**.

Starting from the time Nurse Johnson was actually asked to come to the hallway to see Mr. Lewis, i.e. when a male CO speaks into the nursing station at **01:00:44** and Nurse Johnson responds by putting on gloves, obtaining Mr. Lewis's buff card from the female CO, looking him up on CH EMR, speaking with Sgt Loboda who had re-entered the nursing station (this time, to actually speak with her), grabbing a rolling vital signs machine, and following Sgt Loboda into the hallway at **01:02:32**, was **2 minutes and 48 seconds**.

Whether one chooses to use **00:58:35** or **01:00:44** to "start the clock" on the timeliness of Nurse Johnson's response, it cannot be said that she acted with deliberate indifference to a subjectively known serious medical condition of Mr. Lewis. Plaintiff's allegation that "it took (LVN Johnson) over five minutes and multiple requests and demands from the officers to respond to the medical needs of Lewis" is belied by the CCTV video evidence. The videos show no "multiple requests and demands" and no urgency by Sgt. Loboda and/or DSO Tavera, and it shows no refusal of care by LVN Johnson. Simply viewing the Hallway Camera and Inside Camera is enough to establish that there was no deliberate indifference. Also, the opinion of Nurse Johnson's supervising Nurse Practitioner Yewande Wilson is that the Hallway Camera and Inside Camera CCTV videos

show that "LVN Johnson did not fail to respond timely when Mr. Lewis was brought to our nursing station." (Wilson Affidavit, Appx, p 0045; see also *id.* at p 0047.)

**B. Rule 7(a) Reply allegation**: "(Nurse Johnson, Nurse Nwazue, Nurse Davis, and Nurse Wilson) failed to timely provide Shamond Lewis with an automated external defibrillator, with knowledge of the serious medical needs of Shamond Lewis." (Dkt 101, pp 6-8.)[3]

**As to Nurse Johnson**:

Johnson Affidavit: "[A]t **01:04:30**, before the COs got Mr. Lewis inside the nursing station, NP Wilson and I are seen on the Inside Camera CCTV video walking into the nursing station from the hallway, and as she returns the rolling vital signs machine to its place I go to my work station to re-glove and get the 'crash cart' and Automated External Defibrillator (AED) from where they are kept just behind my work station, and then I wheel and carry both of them to the patient. I got them to the patient's side at **01:05:02**, before the COs had even gotten Mr. Lewis out of the restraint chair and situated onto the mat. Obviously, any suggestion that Correctional Health personnel did not know where the AED is located is plainly wrong. We all know where the AED and crash cart are kept, and the CCTV Inside Cameral video shows that." (Johnson Affidavit, Appx, p 0063.)

**As to Nurse Practitioner Wilson**:

Wilson Affidavit: "The Inside Camera CCTV video dispenses with this criticism, which seems to be based on lack of knowledge or misunderstandings of Sgt Loboda and/or DSO Tavera reflected in statements they gave during the Sheriff's Department investigation. Before the COs even got Mr. Lewis inside the nursing station, the Inside

[3] As a point of correction: Ms. Johnson is a Licensed Vocational Nurse. Ms. Nwazue is a Registered Nurse. Ms. Wilson and Ms. Davis are Nurse Practitioners and, and both work as Advanced Practice Providers.

Camera view shows **01:04:30** LVN Johnson and me walking into the nursing station from the hallway ahead of them, and as I return the rolling vital signs machine to its place LVN Johnson goes to her work station to re-glove and get the 'crash cart' and Automated External Defibrillator (AED) from where they are kept just behind her work station, and then wheel/carry both of them to the patient. LVN Johnson had the AED and the crash cart at the patient's side at **01:05:02**, before the Corrections Officers had even gotten Mr. Lewis out of the restraint chair and situated onto the mat for resuscitation. It is **01:05:15**, when the COs have succeeded in getting Mr. Lewis out of the restrain chair and onto the floor mat. At **1:06:17**, the Automated External Defibrillator is applied by LVN Johnson. We know from the Man Down Response Form that the AED advised 'no shock' (Appx, p 0020.) Chest compressions are continued. As the video shows, that was done multiple times. Obviously, any suggestion that Correctional Health personnel did not know where the AED is located is plainly wrong. We all know where the crash cart and AED are kept, and the Inside Camera CCTV video shows that. (Wilson Affidavit, Appx, pp 0048-49; see also Johnson Affidavit, Appx, pp 0063, 0073.)

**As to Nurse Kwazue**:

Defendant Kelechi Nwazue, RN responded to the Man Down Call from her post at the Adult Psychiatric Unit on the Third Floor of the South/Kays Tower. She got to the Second Floor Nursing Station at **1:06:25**. (Nwazue Affidavit, Appx, pp 0079-80.) When she arrived, resuscitation was already ongoing, and the AED was already in use. (*Id*, at pp 0081-82.) This allegation cannot apply to her.

<u>**As to Nurse Practitioner Davis**</u>:

Defendant <u>Carmen Davis, NP</u> arrived to assist with the code 39 seconds after the AED was already at the patient's side. (Davis Affidavit, Appx, p 0094.) This allegation also cannot apply to her.

**C. Rule 7(a) Reply allegation**: "<u>(Nurse Johnson, Nurse Nwazue, Nurse Davis, and Nurse Wilson) failed to timely provide Shamond Lewis with oxygen, with knowledge of the serious medical needs of Shamond Lewis.</u>" (Dkt 101, pp 6-8).)

<u>Wilson Affidavit</u>: "The Inside Camera CCTV video shows that at <u>**01:05:15**</u>, the COs have succeeded in getting Mr. Lewis out of the restraint chair and onto the floor mat. At <u>**01:05:40**</u>, LVN Johnson is seen getting an O2 bottle and wheeling it to where Mr. Lewis is receiving CPR, and I am seen exiting the treatment room putting new gloves on and walking directly to the patient. At <u>**1:06:18**</u> LVN Akomolafe hands NP Davis an Ambu bag so she can administer breaths. At <u>**01:06:41**</u>, NP Davis can be seen unwrapping the Ambu bag and bending over to apply it to ventilate the patient. There was no failure to timely to oxygenate the patient." (Wilson Affidavit, Appx, p 0049; see also, Johnson Affidavit, Appx, p 0073-74, Nwazue Affidavit, Appx, pp 0082-83, Davis Affidavit, Appx, pp 0094-95.)

**D. Rule 7(a) Reply allegation**: "<u>(Nurse Johnson, Nurse Nwazue, Nurse Davis, and Nurse Wilson) failed to timely initiate the Chain of Command regarding concerns of the serious medical needs of Shamond Lewis as paramedics were not called until 1:09:40 and did not arrive on scene until 1:19:07.</u>" (Dkt 101, pp 6-8).)

<u>Wilson Affidavit</u>: "From the Inside Camera CCTV video, at <u>**01:04:50**</u>, Olabasi Akomolafe, LVN is seen going to the phone to call 911, which would summon Acadian

Ambulance Services to come to the site of the code. This occurred before the COs had succeeded in getting Mr. Lewis out of the restraint chair and onto the floor mat at **01:05:15**. According to the Man Down Response form, I am the person who instructed that this call be made. (Appx, p 0020.) At **01:05:17** LVN Akomolafe hangs up the phone from calling for the EMTs and goes to the patient to participate in the resuscitation. From the Inside Camera CCTV video, at **01:21:45** the Acadian Ambulance Services EMTs are seen arriving. The Man Down Response Form says 'Acadian EMS personnel arrived @**0123**, transfer of care conducted,' and that 'Airways maintained via NRB (non-rebreather)' until they did arrive. (Appx, p 0020.) Even assuming that the EMTs took some unusual amount of time to arrive once being called, this would certainly not be a deliberate action by Correctional Health staff to delay their arrival." (Wilson Affidavit, Appx, p 0050; see also, Johnson Affidavit, Appx, p 0074.)

All of this occurred before Movants Kelechi Nwazue, RN and Carmen Davis, NP arrived to assist with the Man Down resuscitation (Nwazue Affidavit, Appx, p 0083, Davis Affidavit, Appx, p 0095), so this allegation cannot apply to them.

## VIII.
## Causation

Defendants further assert, as an additional ground for their motion for summary judgment, that under the summary judgment evidence, as a matter of law, there is no proximate cause connecting any alleged subjective deliberate indifferent conduct of Defendants to any alleged injuries/damages of Shamond Lewis. To bring an action under 42 U.S.C. § 1983, Plaintiff must establish common law proximate causation. *Murray v. Earle*, 405 F.3d 278, 290-291 (5th Cir. 2005). Plaintiff has not done so and cannot do so. The record has no competent evidence that Defendants caused injury to Mr. Lewis.

## IX.
## Summary and Conclusion

Applying the standards of *Domino* to this matter, Plaintiff fails to satisfy her burden. Plaintiff has no evidence of any of the elements to prove an Eight/Fourteenth Amendment claim. Plaintiff has no evidence that Defendants/Movants were aware of a known serious medical condition that they deliberately disregarded. Defendants' affidavits and the CCTV video prove that Plaintiff's allegations against them did not happen. As is discussed in detail in paragraph **VI.** above, and as supported in detail by Movants' Affidavits and the CCTV videos defining their individual involvement in Mr. Lewis's care, Defendants did not violate any clearly established constitutional right of Mr. Lewis and their conduct was not objectively unreasonable. Defendants were not deliberately indifferent to Mr. Lewis's condition and need for medical treatment. They did not ignore him or refuse to treat him for a serious medical condition when they became subjectively aware of it. The summary judgment evidence establishes that Defendants each acted in good faith at all times relevant to their involvement in the care of Mr. Lewis. Their involvement in Mr. Lewis's care in no way rose to the level of egregious intentional conduct required to satisfy the deliberate indifference standard. See *Gobert,* 463 F.3d at 351. Movants are accordingly entitled to judgment as a matter of law dismissing them with prejudice.

## X.
## Prayer

WHEREFORE, PREMISES CONSIDERED, Defendants pray that the Court grant their motions for summary judgment and render and sign an order that Plaintiff take nothing by her claims as to each of them; that Defendants recover their costs in this behalf expended; and that Defendants have such other and further relief to which they may each show themselves justly entitled.

Respectfully submitted,

/s/ *Winston L. Borum*

Winston L. Borum (02675500)
Watson, Caraway, Midkiff & Luningham, LLP
306 W. 7th Street, Suite 200
Fort Worth, Texas 76102
817.870.1717
Fax 817.338.4842
**WBorum@watsoncaraway.com**

Attorney for Defendants Adaria Johnson, LVN, Kelechi Nwazue, RN, Carmen Davis, RN, and Yewande Wilson, NP